## METHUEN.

Residence.—Alienage.—Use of check list.—Payment of a tax.—Practice.—Illegal votes.

THE election of Moses Merrill, returned a member from the town of Methuen, was controverted by S. L. Fogg and others, on the ground, that seven illegal votes were given therein for the sitting member, without which he would not have had a majority.

It appeared, by the town records, that at the meeting on the 8th of November, 1841, the whole number of votes given in for representative was 445; necessary for a choice, 223; Samuel H. Harris had 222; Moses Merrill, 221; scattering, 2; and there was no choice. The meeting was then dissolved, and at a subsequent meeting called and held on the fourth Monday, the whole number of votes given in for representative was 460; necessary to a choice, 231; Moses Merrill had 232; Samuel H. Harris had 227; scattering, 1; and Moses Merrill was declared to be elected.

[1] 64 J. H. 199.

The petitioners objected to the votes of Charles Barker, Joseph C. Emerson, Branch Gutterson, George W. Chadwick, Daniel P. Eaton, William White and Dudley Smith, all whose names were borne on the list of voters, and were found checked on the list which was used at the meeting.

The names of Emerson and Gutterson were inserted on the list as Joseph Emerson, and B. G. Gutterson. They were all proved by other evidence to have voted at the election, and for Moses Merrill.

Charles Barker's vote was objected to, on the ground, that he had not been an inhabitant of Methuen, at the time of the election, for six calendar months previous thereto. It appeared in evidence, that in the month of April, 1841, Barker was at work in a paper-mill in Methuen, and was taxed there as of the 1st of May following; that in June of the same year, he applied to another person in Methuen for employment in putting up machinery, saying that he wished to change his business; that he made an engagement accordingly, by which, after visiting his friends in Fairhaven, for a few weeks, he agreed to return on being informed by letter, that his employer was ready for him; and that he was written to for the purpose, and came to Methuen, about a fortnight before the election. He was not employed, however, according to the agreement, on his return; but claimed damage for the breach of contract, and was to be employed afterwards, if the other party should want him.

The vote of George W. Chadwick was objected to on the same ground. From his own testimony it appeared, that he was twenty-eight years of age; that he then lived at Methuen, and had lived there twenty-seven years; that he owned a tenement; and had household furniture then there; that on the 8th of April, previous to the election, he went to Nashua, taking none of his furniture, and only what he wore, with him; that he returned on the 8th of May to Methuen, and staid at home a week; that he was at home again two or three days in June, and on the last of July or first of August, returned home permanently; that while at Nashua, he was at his

wife's father's, where he went at the request of his wife's mother, for a visit, but made a few shoes there in the house; that his intention, when he went, was to make a short visit, certainly to return in May; and that he paid no taxes and attended no town-meetings in Nashua.

The vote of Joseph Emerson was also objected to, on the ground of a want of residence. He testified, that in the fall of 1840, he was at work at Stephens's piano-forte factory in Methuen; that, business growing bad, he accepted an offer to go to Manchester and make two dozen bureaus; that he went there at first principally to carry another person, and when there, was persuaded to take the job above-mentioned; that he agreed to return when Stephens could give him employment, and had no intention of leaving Methuen permanently; that he received a letter from Stephens in February, 1841, informing him that he had employment for him, and inviting him to return, which he did in the month of March following. It appeared, also, that Emerson was twenty-three years old, and had paid his taxes every year in Methuen; that he had no family, but had a mother residing in Methuen; that when he went to Manchester, he carried his tools and clothes, but left his old clothes with his mother at Methuen; and that he voted in Manchester in March, 1841. When he left Methuen to go to Manchester, he told Stephens that he would come back at any time, when he would give him good encouragement. It was also in evidence, that Emerson was a member of a Methodist church in Methuen, and that when he went to Manchester, he received a letter of recommendation, which, it was testified to by one witness, an officer of the church in Methuen, was only asked for when the applicant intended to remain away permanently. Another witness, who was a member of the Methodist church in Boston, testified, that when a man belonging to a Methodist church leaves, intending to be gone some time, although finally to return, it is usual to take a certificate with him. When such a letter is taken, if the party presents it at any other church, he must bring back one from that other church, before he can be readmitted to fellowship.

The objection alleged against Daniel P. Eaton's vote was, that he was an alien by birth; in relation to which it appeared that his father, who was a citizen of the United States, as early as 1802, and previous thereto, went to Canada about the year 1818, where he died in 1836. His son, the voter, was born in Montreal, in 1818, about seven months after his parents went there. He had been married and been taxed there.

The vote of Branch Gutterson was also objected to, on the ground, that he was an alien born. The father of this voter was born in Methuen, and was then sixty-two years old; he resided in Methuen until he was seventeen years old, when he went to Haverhill to learn a trade, where he remained until he was twenty-one; he then worked in the vicinity until 1802, when he went to Nova Scotia. He lived in Nova Scotia twenty-three years, during which time he worked alternately, for seven or eight years, in Nova Scotia and the United States, and returned finally to Methuen in 1825, where he had since resided. Branch Gutterson, the voter, was born in the province of Nova Scotia, came with his father to Methuen in 1825, where he had since resided, and in June, 1841, was about twenty-one years of age.

William White, whose vote was called in question, on the ground of a want of residence, testified, that his family lived in Methuen, where he had lived almost all his life; that about three years previous, being advised to go to the sea-board for the health of himself and wife, he went accordingly to Salem; leaving some of his goods stored at Methuen, where he had previously kept house; that his health improved, and his wife grew worse, by the removal; that as soon as his wife could be moved, which was in January, 1840, he carried her back to Methuen, and boarded her there; that he went back to Salem, and boarded and worked there as a shoemaker, visiting his wife in Methuen, once in four or five weeks, until the 17th of May, 1841, when he left Salem and travelled with a circus company through the states and the British provinces, until the 9th of October preceding the election; that he had paid

three tax bills in Salem, and had voted there at two annual elections; and that if he had been at Salem in November, 1841, he should have voted there.

The vote of Dudley Smith being objected to on the same ground, he testified, that he had no family, and had lived in Methuen till the spring previous; that having no real estate in Methuen, and for two years having been out of business, he had been boarding at the tavern there; that having an offer of his board to go to Hampton Beach to tend bar, he went there accordingly, on the 6th or 7th of July, 1841, leaving his extra and thick clothing at Methuen, and declaring that he should return in a fortnight; that he staid longer, and might have remained still longer, but that tending bar at Hampton Beach, in the summer, was hard work.

The sitting member offered, and was allowed to give evidence, to prove, that four persons, namely, Luther Parker, Albert Fales, Nathaniel Mower, and Stephen W. Wise, who voted at the election against the respondent, were illegal voters.

Luther Parker, whose vote was questioned on the ground of a want of residence, had, for the twenty months previous to the hearing, worked in a saw mill at Methuen, being absent during that time about two months while the water was too low for working the mill. He had been taxed twice in Methuen. Twice in a year he went to Nashua to visit his wife and children, who kept house there.

Albert Fales, who was alleged not to have paid a tax within the time required by the constitution, testified, that he first came to Methuen eleven years before, and remained there until 1837, when he went to Lowell, and remained there and at New London in New Hampshire, away from Methuen, until the last or middle of December, 1840. He further testified, that he paid no tax in 1841, but that he paid a tax in Lowell in 1840. To contradict this last statement, the respondent introduced a certificate of the treasurer and collector of Lowell, sworn to by him, that no man, by the name of Fales, appeared to have been taxed to the city of Lowell for the year 1840.

In regard to Nathaniel Mower, whose vote was objected to on the ground of a want of residence in Methuen, it appeared, from his own evidence, that he had lived at Methuen since 1835, working at hatting; that he had been absent at times at Lowell, where he had a wife and children; that his wife kept house at Lowell, to the expenses of which he contributed about 50 or 60 dollars a year; that he visited his family once in four, five, or six weeks, remaining with them two or three days at a time; and that he had always paid taxes and voted in Methuen.

It appeared that Stephen H. Wise, whose vote was questioned on the ground of a want of residence, came from Hebron, N. H., to Methuen, in 1833, where he remained nearly six years, with occasional absences of a month or six weeks at a time. In November, 1838, he went to Danvers, and worked there until the spring of 1840. He was then absent at various places, in this state and New Hampshire, until the 19th of April, 1841, when he returned to Methuen, taking with him his property from Danvers. He remained in Methuen, and voted at the election in November, 1841.

The committee on elections, before giving their opinion to the house, as to the qualifications of the several voters who were objected to on the one side and on the other, presented their views, preliminary thereto, as follows :—

"Joseph C. Emerson voted in Methuen, when there is no such name on the list, and Joseph Emerson's name is checked, and there are other similar cases. On this, the question arose before the committee, whether a person, otherwise a legal voter, having all the requisites prescribed in the constitution, became an illegal voter, by not being able to find his name on the check list.

And on this point the committee believe, that the whole law regulating the forms and proceedings at elections is merely directory, and can not deprive a voter of rights which he holds under the constitution; that if, for instance, Joseph C. Emerson was a legal voter in Methuen, was twenty-one years old, had lived in Massachussetts one year, and in Me-

thuen six calendar months, and had paid a tax legally assessed within two years, the selectmen had a right to receive his vote, though his name could not be found on the check list.

The committee were obliged to establish in the committee-room certain principles of the admissibility of testimony, which they think in accordance with the law of the land. But as all their doings are subject to the supervision of the house, they feel it a duty to suggest upon what principles they acted.

1. They allowed either party to prove how a person voted, and that he did vote, either by the oath of the voter himself, or of some other person who could verify the fact.

2. They refused to hear testimony of the declarations of a voter that he voted, or for whom he voted, unless where the voter himself had been called and declined answering for fear of criminating himself.

3. They allowed proof from either party, by the voter or *aliunde*, as to any fact showing residence or removal, not requiring the voter to be first examined on this point.

4. They freely admitted testimony of the voter's statements respecting his intentions, motives, &c., bearing upon his removals from place to place, because his intent is the gist of the matter, and can be gathered as much from his sayings at the time, as his doings."

The committee, then, applying to the several cases, the principles relating to the law of domicil, established by the supreme judicial court in the cases of *Sears*, v. *Boston*, 1. Met. 250, *Thorndike* v. *Boston*, 1. Met. 245, *Lincoln* v. *Hapgood*, 11 Mass. 350, and *Jennison*, v. *Hapgood*, 10 Pick. 77, reported, that in their opinion, George W. Chadwick, Joseph Emerson, and Dudley Smith, objected to by the petitioners, and Luther Parker, Nathaniel Mower, and Stephen H. Wise, objected to by the sitting member, were duly qualified as to residence, and their votes properly received; and that Charles Barker and William White, objected to by the petitioners, were not duly qualified as to residence, and their votes ought to have been rejected.

They also reported, that Daniel P. Eaton and Branch Gutterson, objected to by the petitioners as aliens, were to be con-

sidered as citizens of the United States, although born in a foreign country, within the express provisions of the act of congress of the 14th of April, 1802, relative to the children of persons who then were or had been citizens of the United States.

The committee further reported, that they were satisfied by the evidence, that Albert Fales, objected to by the sitting member, had not paid a tax legally assessed upon him within two years, and that his vote ought therefore to have been rejected.

The committee having rejected two votes in favor of the sitting member, and one vote against him, recommended that the petitioners have leave to withdraw their petition.

The report, concluding as above, was read and rejected by the house; who, thus, in effect, confirmed the election, without adopting the reasoning or conclusions of the committee.[1]